J-A08014-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEVIN RASHAWN CARPENTER | : | |
| | : | |
| Appellant | : | No. 985 EDA 2020 |

Appeal from the Judgment of Sentence Entered January 16, 2020
In the Court of Common Pleas of Delaware County
Criminal Division at No(s):  CP-23-CR-0006873-2018

BEFORE:   PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.:          **FILED SEPTEMBER 13, 2021**

Kevin Rashawn Carpenter appeals from the judgment of sentence entered on January 16, 2020, following his convictions for criminal attempt - murder of the first degree, aggravated assault, and discharge of a firearm into an occupied structure. On appeal, Carpenter argues the trial court erred when it granted the Commonwealth's pre-trial motion for joinder and when it permitted a non-expert witness to testify regarding cell phone location data. Finally, Carpenter argues the trial court erred in denying him a new trial based on after-discovered evidence. After careful review, we affirm.

In 2017, the victim began a relationship with Carpenter after visiting him frequently at the phone store where he worked. At the time, the victim

_____

[*] Former Justice specially assigned to the Superior Court.

was twenty-six and Carpenter was eighteen. They eventually decided to separate but continued to keep in contact.

On April 2, 2018, around midnight, the victim was asleep at her apartment. She eventually woke up to a few missed calls from Carpenter. After attempting to call Carpenter back, with no response, the victim heard a car pull up outside her building. She looked out the window to see Carpenter getting out of his Jeep and walking towards the front door. She went downstairs and opened the door slightly to talk to Carpenter, while attempting to not let in him. However, Carpenter managed to get through the door and went up to her apartment. While inside, he began searching around her room, eventually finding an envelope with money in it that she had been saving for a car. Carpenter took the money and left. The victim then called the police. The victim testified that she attempted to contact Carpenter to get the money back but he never returned the money. This incident formed the basis of criminal complaint #6866-2018.

On June 24, 2018, sometime around 2:00 a.m., the victim was at a nearby Lukoil gas station, along with her sister and her sister's friend. As she pulled up to a pump, she noticed Carpenter pull up in his Jeep behind her. They had no interaction at the gas station.

However, on her drive back to her mother's house, the victim stopped at a red light and felt the back of her car get bumped by Carpenter's Jeep. The victim then drove around the block twice and called her family to come

outside. When she pulled up to her mother's house, she joined her family members in front of the house.

Carpenter pulled up and parked on the opposite side of the street. The victim, along with her family members, asked Carpenter why he was following her. Carpenter did not respond, but the victim heard yelling coming from other people in his car. About a minute after pulling up, Carpenter drove down to the corner of the street, rolled down his window part way, and fired off four or five shots.

The victim and her family members immediately ran back to the home and did not see where Carpenter went afterwards. No one was injured. The victim immediately called the police, who arrived shortly thereafter. No shell casings or other evidence of a shooting was recovered. This incident formed the basis for criminal complaint #6850-2018.

Throughout the following day, the victim kept receiving threatening phone calls from Carpenter, which she reported to the police. On June 25, 2018, the victim filed for a temporary protection from abuse order.

On June 26th, 2018, at approximately 2:00 a.m., the victim was at her mother's house. She was still receiving threatening phone calls from Carpenter so she called the police again. When officers arrived, Carpenter was still calling and threatening her, so she put the phone on speaker to let the police listen as Carpenter talked. Carpenter kept asking where she was and threatening her, even after the police identified themselves. Officer Jeffrey Abreu and

Officer Edward Colon confirmed the victim's testimony about this incident which formed the basis for criminal complaint #6849-2018.

The victim informed Officer Colon that Carpenter used a police scanner to monitor the police. Officer Colon therefore provided the victim with his direct phone number, so that the victim could contact him without Carpenter being alerted.

Shortly after the police left, at approximately 3:30 a.m., the victim was sitting in the living room of her mother's home with her brother when she heard a sound on the front porch. Multiple other family members were also home at the time. She looked out the window, where she saw Carpenter walking up. She immediately started running up the stairs. When she reached the second floor, she heard shots being fired. She then continued up to the third floor, where she called Officer Colon. Her little sister called 911.

Officers responded to the scene. After performing an overview of the scene, eight shell casings were recovered, and damage to the front window was observed, including several projectile holes. Carpenter's Jeep was found parked a few blocks away. Carpenter later consented to a search of the vehicle. Once inside, officers located Carpenter's ID in the center console, and four shell casings.

Brian Knowlton, a digital forensic analyst employed by the Delaware County Criminal Investigation Division, was provided Carpenter's two iPhones for extraction of data pursuant to valid search warrants. Knowlton testified

about the software he uses for extracting data from cell phones and how he used that software to extract data from both of Carpenter's iPhones. Using that data, Knowlton was able to determine the G.P.S. coordinates of Carpenter's phone at the time of the incident, by cross-referencing the data with Google Maps, which placed him in the area of the incident. Appellant was arrested and charged with four separate criminal informations for the four separate incidents.

On March 5, 2019, the Commonwealth filed a motion for joinder of the four complaints pending against Carpenter. Specifically, the Commonwealth argued that all four incidents occurred within a three-month time period, involved the same victim, and when heard together paint the complete picture of the relationship between Carpenter and the victim. The Commonwealth further argued that evidence of one incident would be admissible at trial in each of the other incidents, and that there was no risk of jury confusion. After a hearing, the trial court granted the motion.

On November 14, 2019, following trial, the jury reached verdicts on each of the four incidents. The jury found Carpenter not guilty on all counts under docket #6866-2018, and docket #6850-2018. On docket #6849-2018, Carpenter was found guilty of terroristic threats and stalking.

Under docket #6873-2018, from which the current appeal lies, the jury found Carpenter guilty of criminal attempt - murder of the first degree, aggravated assault, and discharge of a firearm into an occupied structure. He

was later sentenced under this docket to nine to eighteen years' imprisonment, followed by five years' probation.

Carpenter subsequently filed a post-sentence motion, which the trial court denied after a hearing. This timely appeal followed.

Carpenter raises the following issues on appeal:

1. Whether the lower court erred when it granted the prosecution's pre-trial motion for joinder, where evidence of the offenses charged in the separate [i]nformations would be inadmissible in separate trials for the others, where joinder created the danger of confusion by the jury, and where joinder caused unfair prejudice against [] Carpenter?

2. Whether the lower court erred when, over defense objection, it permitted Brian Knowlton to testify regarding cell phone location data and G.P.S. coordinates, where the prosecution never qualified Mr. Knowlton as an expert by knowledge, skill, experience, training or education, and his testimony in these respects required scientific, technical, and/or other specialized knowledge beyond that which an average [lay person] possesses?

3. Whether the lower court erred when it denied [] Carpenter's post-sentence motion for a new trial based on newly-discovered evidence, where the defense did not discover until after trial material, favorable and/or exculpatory evidence that the prosecution's key witness, the complainant, requested that the "victim's advocate" tell the District Attorney she was unwilling to testify and no longer desired to proceed against [] Carpenter?

Appellant's Brief, at 5.

In Carpenter's first issue, he contends the trial court erred in granting the Commonwealth's pretrial motion for joinder. *See* Appellant's Brief, at 5. Specifically, Carpenter argues it was improper to consolidate the informations in a single trial, because: (1) evidence of the offenses charged in the separate informations would not be admissible in separate trials for the others, (2)

- 6 -

joinder created the danger of confusion by the jury, and (3) joinder resulted in unfair prejudice against Carpenter. ***See id***.

Trial courts wield considerable discretion in deciding whether to consolidate separate indictments for trial:

> [w]hether or not separate indictments should be consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant. Consolidation of separate offenses in a single trial is proper if the evidence of each of them would be admissible in a separate trial for the others and is capable of separation by the jury so that there is no danger of confusion. Evidence of distinct crimes is inadmissible solely to demonstrate a defendant's criminal tendencies. Such evidence is admissible, however, to show a common plan, scheme or design embracing commission of multiple crimes, or to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others. This will be true when there are shared similarities in the details of each crime.

***Commonwealth v. Andrulewicz***, 911 A.2d 162, 168 (Pa. Super. 2006) (citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court we conclude that Carpenter's first issue merits no relief. The trial court opinion properly addresses Carpenter's first claim, and we adopt it as our own. ***See*** Trial Court Opinion, 7/20/2020, at 13-15 (concluding joinder was proper because 1. the incidents in question involved the same defendant, the same victim, and many of the same witnesses, and all four of the incidents occurred within a four-month time period, 2. joinder of all four cases did not suggest to the jury that they should convict Carpenter because of some violent or criminal propensity

but rather enabled the Commonwealth to present the jury with a complete picture of the history between Carpenter and the victim, which was vital to a determination, 3. there was no risk of jury confusion because each of the incidents occurred at a distinct time and place that are all well documented and the verdict sheets were very clearly drafted, identifying each offense separately by date and time, and 4. specifically noting the lack of jury confusion is evidenced by the fact the jury found Carpenter guilty of only two of the four incidents, showing the jury was able to separate the incidents and determine which ones it found the Commonwealth established beyond a reasonable doubt).

In his second issue, Carpenter contends the trial court erred by allowing Knowlton to testify regarding cell phone location data and G.P.S. coordinates, because he was never qualified as an expert and his testimony required scientific, technical, and/or other specialized knowledge beyond that of a lay person.

Our standard of review for the admission of evidence is well-settled:

The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining

party. [A]n evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict.

***Commonwealth v. Manivannan***, 186 A.3d 472, 479-480 (Pa. Super. 2018)

(citation and internal quotation marks omitted).

Pennsylvania Rule of Evidence 702, which governs the admission of expert testimony, provides:

**Rule 702. Testimony by Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

In contrast, Pennsylvania Rule of Evidence 701 governs opinion testimony by lay witnesses:

**Rule 701. Opinion Testimony by Lay Witnesses**

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

Carpenter cites to **Manivannan** for the proposition that Knowlton was required to be an expert to give the testimony at issue. In **Manivannan**, this Court held that expert testimony was required to interpret records of e-mail transmissions and the nature of internet protocol ("IP") addresses linked to an internet service provider, for purposes of demonstrating a connection between an IP address and a real-world location. **See Manivannan**, 186 A.3d at 483-89. Specifically, we found such information required knowledge of computer science that was "beyond the ken of ordinary laypersons." **See id**. at 486-487; **see also Commonwealth v. Griffith**, 32 A.3d 1231, 1239 (Pa. 2011) ("Pursuant to our general standard, a need for expert testimony arises when the jury is confronted with factual issues whose resolution requires knowledge beyond the ken of the ordinary layman") (citation and internal quotation marks omitted).

While **Manivannan** is not directly on point, we find our further distinction between expert testimony and lay testimony in that case instructive:

> [E]xpert testimony reflects the application of expertise and does not stray[] into matters of common knowledge. We have further explained that expert testimony requires knowledge, information or skill beyond what is possessed by the ordinary juror, and that expert testimony must be distinctly related to a science, skill or occupation which is beyond the knowledge or experience of an

average lay person and does not involve[] a matter of common knowledge.

***Manivannan***, 186 A.3d at 485 (citations and internal quotation marks omitted).

It was stipulated at trial that valid search warrants were obtained for Carpenter's cell phone records and for two separate cell phones found on Carpenter. ***See*** N.T., 11/13/2019, at 161-62. Knowlton, a forensic analyst, obtained the cell phones through a chain of custody. At trial, Knowlton testified regarding the process of how he extracts data from cell phones, including G.P.S coordinates, and how he then is able to map a person's location using Google Maps. ***See id***. at 166-170, 182. He denied any knowledge of how the coordinates were calculated. ***See id***. at 181-2, 197-8.

This specific issue is one of first impression in this Commonwealth. While we acknowledge the Commonwealth's assertion that this technology is in common, everyday use by lay persons, the procedure used here is akin to hearsay. Knowlton did not assert he had independent knowledge of Carpenter's location; rather, he relied on assertions generated by ostensibly automated processes.

Fundamentally, the issue appears to be limited to the accuracy and reliability of the coordinates generated. Knowlton disclaimed any specialized knowledge on this issue. Further, as Carpenter points out, depending which method is used to generate the coordinates, the accuracy can vary due to circumstances such as cell tower locations. ***See State v. Steele***,169 A.3d

- 11 -

797, 816-817 (Conn. App. 2017). Under these circumstances, it would appear that a witness presenting this testimony would be required to have some knowledge of (a) the method of location used, and (b) the accuracy and reliability of that method in the area in question, whether through personal experience or technical knowledge. Ultimately however, we conclude that we need not decide this thorny issue on the record before us.[1]

Even assuming, for purposes of this appeal, that Knowlton's testimony was improper expert testimony, and the trial court abused its discretion in permitting Knowlton to testify regarding the technical process of extracting data from a cell phone and using the G.P.S. coordinates found from that data to track a location, we are convinced, beyond a reasonable doubt, that the exclusion of this evidence would not have impacted the jury's verdict.

Knowlton's testimony was not the only evidence linking Carpenter to the crimes charged, nor was it crucial to a guilty verdict. The Commonwealth did not need to establish an affiliation between the G.P.S. data extracted from Carpenter's cell phones and the real-world physical locations of that data. The victim positively identified Carpenter as the man she saw walking up to the front of her mother's house moments before she heard gunshots. ***See*** N.T.,

_____

[1] Perhaps a future case can create a better record by way of a pre-trial ruling on the admissibility of such evidence, allowing a defendant to present expert evidence challenging the testimony without forcing the defendant to present evidence at trial. Here, the record is devoid of any evidence regarding the accuracy and reliability of the method Knowlton employed in the area of the victim's mother's home.

11/13/2019, at 63-64. Police found shell casings outside the home and bullet damage in the home. *See id*. at 202, 207. Police also found Carpenter's vehicle parked nearby with shell casings in it. *See id*. at 211-218. Officer and crime scene investigator Jeffrey Linowski opined that the bullets had been fired into the home from either the porch or otherwise directly in front of the home. *See id*. at 211.

Furthermore, the interrelated nature of all the incidents leading up to the shooting provided a *res gestae* that strongly implied that Carpenter was the person who shot at the victim's mother's home. The jury clearly credited the victim's testimony, along with the testimony of multiple police officers who corroborated the evidence inculpating Carpenter.

Therefore, even if Knowlton had never given his testimony, the jury would have still heard that Carpenter's vehicle was parked nearby the crime scene. Further, the jury heard the victim's positive identification of the man she saw walking up to the front of the home moments before she heard shots fired. Finally, these two pieces of evidence were bolstered by the extensive evidence showing that Carpenter had threatened to kill the victim by shooting her. Under these circumstances, we conclude the jury's verdict would have been the same based on the multitude of other evidence presented. For these reasons, we conclude that to the extent that the G.P.S. evidence was erroneously admitted, said error was harmless.

Carpenter's final claim is that the trial court erred when it denied his post-sentence motion for a new trial based after-discovered evidence.

> After-discovered evidence is the basis for a new trial when it: 1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of trial by the exercise of reasonable diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely for impeaching the credibility of a witness; and 4) is of such nature and character that a new verdict will likely result if a new trial is granted. Further, the proposed new evidence must be producible and admissible.

**Commonwealth v. Chamberlain**, 30 A.3d 381, 414 (Pa. 2011) (citations and internal quotation marks omitted). "The test is conjunctive; the defendant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted." **Commonwealth v. Padillas**, 997 A.2d 356, 363 (Pa. Super. 2010) (citations omitted).

In his motion for post-trial relief, Carpenter contended that since the trial he had learned the victim had at some point prior to trial expressed a desire not to proceed, or an unwillingness to testify, to the "victim's advocate" and had asked that this be communicated to defense counsel. He argued that her apparent wishes were not followed, and as such he should be granted a new trial.

With respect to the first prong, Carpenter simply states that neither he nor his counsel could have obtained this evidence before trial concluded. With respect to the second prong, Carpenter again simply states that this new evidence is not merely corroborative or cumulative, as the jury never heard this evidence during trial from any other source. Regarding the third prong,

Carpenter argues the evidence will not be used solely to impeach the victim, asserting that instead, the victim's refusal to testify against Carpenter at trial, even if temporary, "calls into serious question" whether she stands by her earlier accusations. Finally, with respect to the fourth prong, Carpenter argues that if this after-discovered evidence was presented to a jury, a different outcome is likely because a skilled defense counsel could use it to obtain a recantation from the victim.

The Commonwealth argues the after-discovered evidence alleged by Carpenter does not entitle him to a new trial because the information provided is inadmissible hearsay and would not compel a contrary result at a new trial.

The trial court addressed this claim during a hearing held on Carpenter's post-sentence motion as follows:

> [Defense Counsel]: … And regarding the -- subsection (d), that was -- that information was brought to me after the verdict had gone through regarding the fact that there was a conversation overheard by one of the individuals who was outside in the hallway because they were sequestered in light of the fact that they were -- they potentially could've been called as a witness and it was not brought until after the jury's verdict to my attention.
>
> THE COURT: So hold on there. Let me back this up. It was not discovered until after trial [the victim] specifically requested the victim's advocate to tell the District Attorney of her desire not to proceed and unwillingness to testify, to which the advocate failed to do so? So did [the victim] testify?
>
> [Defense Counsel]: She did testify.
>
> THE COURT: Well, she could've refused to testify when she was on the witness stand.

- 15 -

[Defense Counsel]: I understand that, Your Honor, and that's why I did put in there it was afterwards that I found that information.

THE COURT: Well, if she testified, she testified.

[Defense Counsel]: Yes, Your Honor.

THE COURT: She sat here. She had a right to say I don't want to testify.

[Defense Counsel]: She did, and if that knowledge was known, I could've also have questioned her as to whether or not --

THE COURT: Well --

[Defense Counsel]: -- she wanted to do that.

THE COURT: -- that's hearsay anyhow.

[Defense Counsel]: I understand, sir.

THE COURT: So that's going to be denied.

N.T., 3/5/2020, at 4-7. The trial court thereafter filed an order denying this claim.

> Unless there has been a clear abuse of discretion, an appellate court will not disturb the trial court's denial of an appellant's motion for a new trial based on after-discovered evidence. In order for after-discovered evidence to be exculpatory, it must be material to a determination of guilt or innocence.

*Chamberlain*, 30 A.3d at 416 (citations omitted).

We conclude Carpenter is not entitled to a new trial. First, the information brought by Carpenter is not actual evidence of anything. There was no actual evidence presented that the victim was reluctant to testify. The information presented by Carpenter is simply inadmissible hearsay. It is not even clear from the record who overheard the alleged comment or who made

- 16 -

the alleged comment. Carpenter has failed to show the alleged statement would be producible or admissible at trial. *See Commonwealth v. Scott*, 470 A.2d 91, 95 (Pa. 1983).

Moreover, even if the information identified by Carpenter constituted actual evidence, it would not meet the four-prong admissibility test. Although Carpenter argues the "evidence" will not be used solely to impeach the victim, he goes on to state the victim's refusal to testify against Carpenter at trial, even if temporary, "calls into serious question" whether she stands by her earlier accusations. This is a direct attack on the victim's credibility. *See Commonwealth v. Castro*, 93 A.3d 818, 827 n. 13 (Pa. 2014) (finding appellee's suggestion regarding third prong was based on the degree of impeachment he anticipates he would inflict, and noting that "[e]ven if his impeachment would 'destroy and obliterate' a witness, it is still impeachment[.]").

Carpenter cites to *Commonwealth v. Rivera*, 939 A.2d 355 (Pa. Super. 2007) for his assertion. In *Rivera*, we remanded for an evidentiary hearing to determine whether a new trial was required based on after-discovered evidence that a laboratory technician who testified as to the type and amount of drugs recovered at the crime scene allegedly was corrupt and engaged in illegal practices. There, with respect to the third prong, we found the after-discovered evidence did more than simply impeach the technician's testimony, finding it called "*into serious question* the type and amount of drug

upon which Appellant's conviction and sentence is based." *Id*. at 359. Here, there is no such additional function of the new information presented by Carpenter.

Therefore, the trial court did not err in denying relief based on Carpenter's claim of after-discovered evidence. Carpenter's final claim is without merit.

As none of Carpenter's claims on appeal merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/13/2021

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | CP-23-CR-6873-2018 |
| v. | |
| KEVIN CARPENTER | |

A. Sheldon Kovach, Esquire, for the Commonwealth
Max Orenstein, Esquire, for the Appellant

## OPINION

Capuzzi, J.                                         Filed: 7/20/20

This is an appeal from Appellant's judgment of sentence entered on January 16, 2020. On appeal, Appellant raises claims that the guilty verdicts for Criminal Attempt-Murder of the First Degree, Aggravated Assault and Discharge of a Firearm into an Occupied Structure, were against the weight of the evidence. In addition, Appellant argues that this Court erred when it granted the Commonwealth's pre-trial motion for joinder[1] and when it permitted trial testimony with regard to cell phone location data by non-expert witness. Lastly, Appellant argues that this Court should have granted Appellant a new trial based upon after-discovered evidence of the apparent unwillingness of the victim to testify. For the forthcoming reasons, Appellant's issues are devoid of merit and his judgment of sentence should be affirmed on appeal.

---

[1] Pa.R.Crim.P. R. 582

1

## FACTUAL BASIS

Appellant was arrested and charged with four separate incidents, which, after careful review by this Court, were joined for trial. At trial, Appellant was found guilty of the charges on two of the four cases, docket #6873-2018 and docket #6849-2018. Appellant was found not guilty of the charges on docket #6866-2018 and docket #6850-2018. For purposes of appeal, Appellant has only filed an appeal of docket #6873-2018. However, as Appellant argues that he was unfairly prejudiced by the cases being joined for trial, the factual basis for all of the cases filed against Appellant is germane to the appeal.

Sharmika Phillips (hereinafter Ms. Phillips) is twenty-eight years old and currently resides in Chester, Pa., where she has lived her whole life. [N.T., 11/13/2019 p. 36]. In 2017, Ms. Phillips met Kevin Carpenter (hereinafter Appellant) at his place of employment; she was a customer. [N.T., 11/13/2019 p. 72]. Ms. Phillips was twenty-six and Appellant was eighteen. [N.T., 11/13/2019 p. 72]. The two began a friendship that shortly turned into a romantic relationship. [N.T., 11/13/2019 p. 36]. The relationship was tumultuous, a product of both parties' actions; however, when the two broke up, they remained in contact. [N.T., 11/13/2019 p. 37].

The following facts were the basis of criminal complaint #6866-2018: On April 2, 2018, shortly after midnight, Ms. Phillips was asleep at her apartment in Chester. [N.T., 11/13/2019 p. 38]. Ms. Phillips woke up a short time later in the middle of the night, and saw that she had received two missed calls from Appellant; she returned the call, but no one answered. [N.T., 11/13/2019 p. 39]. Ms. Phillips heard a car running outside of her window and when she looked, she saw it was Appellant's Jeep and he was getting out of the car and coming towards her apartment. [N.T., 11/13/2019 p. 39]. Ms. Phillips cracked the door to her apartment building, trying to talk to

2

Appellant without allowing him inside; however, Appellant pushed past her, went up the steps to her apartment, went inside and began searching around her room, never saying what he was doing. [N.T., 11/13/2019 p. 39]. Appellant located an envelope in her top drawer which contained $1,600, which Ms. Phillips was saving to buy a car. [N.T., 11/13/2019 p. 41]. Appellant took the money and left the apartment and never returned it, despite Ms. Phillips' requests. [N.T., 11/13/2019 p. 42]. At 4:19a.m., Ms. Phillips called 911 and reported what had just occurred with Appellant. [N.T., 11/13/2019 p. 42]. [2]

The following facts were the basis for the criminal complaint #6850-2018: On June 24, 2018, at approximately 2:00a.m., Ms. Phillips was at Luke Oil Gas Station, located at Ninth and Highland, in Chester, along with her sister and her sister's friend. [N.T., 11/13/2019 p. 44]. As Ms. Phillips was pumping her gas, she noticed that Appellant had pulled up behind her in his Jeep; the two did not have any interaction at that time. [N.T., 11/13/2019 p.46]. As Ms. Phillips started driving to her mom's house on 7th and Highland Avenue, she stopped at a red light and felt the back of her car get bumped by the car behind her; it was Appellant in his Jeep. [N.T., 11/13/2019 p.46]. Ms. Phillips drove around the block twice; Appellant followed, so Ms. Phillips called her family to come outside of her mom's house incase Appellant continued to follow her [N.T., 11/13/2019 p. 46]. When she pulled up at 609 Highland Avenue, a few of her family members were waiting outside; Ms. Phillips and her sister got out of the car. [N.T., 11/13/2019 p. 48]. Appellant parked his Jeep directly across the street. [N.T., 11/13/2019 p. 48]. Ms. Phillip's family was hollering at Appellant to leave her alone; Appellant did not say anything, but Ms. Phillips did hear yelling coming from females in his car. [N.T., 11/13/2019 p. 48]. About a minute later,

---

[2] The 911 recording was admitted by way of stipulation and marked as C-2 and the CAD report as C-3.

Appellant pulled away, drove about two houses up from her mom's, and stopped at the corner of Sixth and Highland Avenue; Ms. Phillips are her family were still outside of her mom's house [N.T., 11/13/2019 p. 48]. When he reached the corner, Appellant rolled down his window, pointed a gun in their direction and began shooting. [N.T., 11/13/2019 p. 49]. Ms. Phillips and her family began running inside. [N.T., 11/13/2019 p. 49]. Ms. Phillips did not see in what direction Appellant drove away because she was running inside; she immediately called the police. [N.T., 11/13/2019 p. 50]. [3] [4]

Officer Gary Richardson am eleven-year patrolman with the Chester City Police Department, responded to 609 Highland Avenue, within two minutes of receiving the dispatch for shots fired, and spoke with Ms. Phillips. [N.T., 11/13/2019 p. 144]. Ms. Phillips appeared to be shaken up and reported that Appellant had fired shots at her. [N.T., 11/13/2019 p. 145]. Officer Richardson canvassed the area for shell casings or other evidence of a shooting, but did not recover anything. [N.T., 11/13/2019 p. 145]. Officer Richardson authored an incident report, which included that Appellant did not have a license to carry a firearm. [N.T., 11/13/2019 p. 146].

The following facts gave rise to criminal complaint #6849-2018: The following day, June 26th, at approximately 3:00a.m.., Ms. Phillips was at her mother's house on Highland Avenue. [N.T., 11/13/2019 p. 59]. Ms. Phillips kept receiving threatening phone calls from Appellant, so she called the police. When officers arrived, Appellant was still calling and threatening her, so she put her phone on speaker and let them listen as Appellant talked. [N.T., 11/13/2019 p. 60].

---

[3] At trial, the 911 recording was admitted via stipulation as C-5 and the CAD report as C-6.
[4] The following day, June 25th, Appellant repeatedly called Ms. Phillips, threatening that he was going to shoot her. [N.T., 11/13/2019 p. 37]. Ms. Phillips file for a temporary protection from abuse order which was granted.

Appellant kept asking where she was and stating that he wasn't going to leave her alone. [N.T., 11/13/2019 p. 60].[5]

Officer Jeffrey Abreu, a three-year patrolman with the Chester of Chester Police Department, responded to 609 Highland Avenue. [N.T., 11/13/2019 p. 152]. When he arrived, Ms. Phillips was on the phone with Appellant at the time. [N.T., 11/13/2019 p. 153]. Officer Abreu asked Ms. Phillips to put the phone on speaker; Officer Abreu heard Appellant threaten to harm and kill Ms. Phillips. [N.T., 11/13/2019 p. 153]. Officer Abreu identified himself to Appellant as a police officer, to which Appellant responded that he wasn't "giving a fuck about the police" and was going to have a shoot out with police and "whack Ms. Phillips." [N.T., 11/13/2019 p. 153]. Appellant identified himself, by name, to Officer Abreu. [N.T., 11/13/2019 p. 154]. Officer Abreu documented in this in his report.

Officer Edwin Colon, a three-year patrolman with the City of Chester, twice responded to 609 Highland Avenue on June 26, 2018. [N.T., 11/13/2019 p. 235]. The first time Officer Colon responded was at 2:23a.m., was a result of a call for a domestic dispute. [N.T., 11/13/2019 p. 235]. When he arrived, Officer Colon met with Ms. Phillips outside of the residence; she told Officer Colon that her ex-boyfriend, Appellant, had recently split up and were having problems. [N.T., 11/13/2019 p. 236]. Ms. Phillips appeared distraught and shaken up. [N.T. 11/13/2019 p. 236]. As they were speaking, Ms. Phillips was receiving phone calls from Appellant; when she answered, she placed the phone on speaker and Officer Colon could hear Appellant threatening to kill her and that he would come shoot her. Appellant said, "If you're not going to be with me, you're going to die by me." [N.T., 11/13/2019 p. 237]. Ms. Phillips informed Officer Colon that Appellant had

---

[5] At trial, the 911 recording was admitted via stipulation as C-8 and the audio admitted as C-9 and the CAD report admitted as C-10.

5

a police scanner; Officer Colon provided Ms. Phillips with his personal contact information, so Ms. Phillips could call the police and it not be broadcasted as a dispatch call so that if Appellant did come to harm her, he would not hear the call and be able to flee. [N.T., 11/13/2019 p. 238]. While Ms. Phillips was on the phone with Appellant, Officer Colon heard Appellant ask why his name was being broadcasted over the air. [N.T., 11/13/2019 p. 239]. When he left, Officer Colon parked his patrol car in an alleyway on Sixth and Union Street, where he had a clear view of 609 Highland Avenue. [N.T., 11/13/2019 p. 240]. Officer Colon sat in the location incase Appellant figured out where Ms. Phillips was and came to harm her. [N.T., 11/13/2019 p. 240]. As he was sitting in the alleyway, Officer Colon received a call of a possible description matching Appellant, so he left the area and proceeded to that location. [N.T., 11/13/2019 p. 240]. The possible description was not Appellant, and that location was cleared. [N.T.,11/13/2019 p. 240].

The following facts gave rise to criminal complaint #6873-2018: Around 3:42a.m., (that same day) after the police had left, Ms. Phillips was in her mom's home, with several of her family members spread throughout the house. [N.T., 11/13/2019 p. 63]. Ms. Phillips was sitting in the living room with her brother when she heard someone out front on the porch. [N.T., 11/13/2019 p. 63]. Ms. Phillips turned to look out the window, where she saw Appellant, walking around the porch, wearing dark clothing. [N.T., 11/13/2019 p. 64]. Ms. Phillips immediately started running up the first flight of stairs; as soon as she reached the top, she heard shots being fired. [N.T., 11/13/2019 p. 64]. Ms. Phillips continued up the second flight of stairs to the third floor. [N.T., 11/13/2019 p. 66]. When she reached the third floor, she called the Officer Colon, who was at her

6

home just a few hours before. [N.T., 11/13/2019 p. 66]. Her little sister called 911. [N.T., 11/13/2019 p. 67]. [6], [7]

As Officer Colon was driving back to 609 Highland Avenue, a call came over dispatch for shots fired at 609 Highland Avenue. [N.T., 11/13/2019 p. 241]. When he arrived, Officer Colon spoke with Ms. Phillips who was in tears, extremely distraught and stuttering as she was trying to explain what had occurred. [N.T., 11/13/2019 p. 243]. Ms. Phillips told Officer Colon that she was in the living room and saw Appellant through the front window. [N.T., 11/13/2019 p. 243]. Ms. Phillips relayed that she saw Appellant walk up onto the porch, walk past the window, walk back down the steps, turn around, point a firearm and begin shooting into the window. [N.T., 11/13/2019 p. 243]. There were nine other people in the house during the shooting, mostly children. [N.T., 11/13/2019 p. 243]. Officer Colon also responded to the 900 Block of Pennell Street when Appellant's Jeep Grand Cherokee was located. [N.T., 11/13/2019 p. 244]. Officer Colon made wrote a report in connection with both of his interactions with Ms. Phillips.

Officer Jeffrey Linowski, a twenty-year officer with the City of Chester Police Department and currently employed as a Crime Scene Investigator, responded to 609 Highland Avenue after they received a dispatch for shots fired into the residence. [N.T., 11/13/2019 p. 202]. When he arrived, Officer Linowski, performed an overview of the scene; eight shell casings were located on the ground in front of 607 Highland. [N.T., 11/13/2019 p. 202]. The shell casings were marked with evidence markers, photographed, and then collected. [N.T., 11/13/2019 p. 202]. Officer Linowski observed damage to the front window of 609 Highland, including several projectile holes. [N.T., 11/13/2019. P. 202]. Photographs of the damage were taken. [N.T., 11/13/2019 p.

---

[6] The 911 call was admitted via stipulation marked C-11. The audio recording of the call was marked at C-12 and the CAD report was marked at C-13.

[7] A few hours later, around 8:00am., Ms. Phillips was still receiving threatening text messages from Appellant. . [N.T., 11/13/2019 p. 69].

203]. [8] Photos taken of the front window next to the door clearly show several projectile holes through the glass, into the residence. [N.T., 11/13/2019 p. 207].[9] Photos taken from inside the house depict where the projectiles entered the window, ripping through the blinds, and one projectile scraping the wall above a light switch. [N.T., 11/13/2019 p. 208]. Officer Linowski also observed fragmentation marks on the couch where a projectile had entered through the back. [N.T., 11/13/2019 p. 209]. [10] Based upon his nine years as a crime scene investigator, the evidence located on scene, led Officer Linowski to believe that the shots were either fired from the first step to the entryway to the porch of 609 Highland or directly down in front, on the actual concrete leading up to 609 Highland. [N.T., 11/13/2019 p. 211].

Officer Linowski was provided a description of the vehicle involved, Appellant's silver Jeep, with the letters "KEV" on the back. [N.T., 11/13/2019 p. 211]. As he was finished with the crime scene processing, Officer Linowski left the scene and drove down Ninth Street, where he turned onto Pennell Street, and observed the Jeep, parked on the side; a photograph was taken. [11][N.T., 11/13/2019 p. 211]. Officer Linowski alerted other units, who arrived on location, ran the tag, and after no one came to claim the vehicle, a hold was placed on the vehicle and it was towed for fingerprints and further investigation. [N.T., 11/13/2019 p. 212].

Later that day, Appellant did sign a consent to search form for the 2003 Grand Jeep Cherokee. [12] Inside the vehicle, officers located, an ID for Appellant in the center console, and

---

[8] At trial, a disc containing the crime scene photos was marked ads C-26. Each photo was then marked individually.
[9] See C-33, C-34
[10] See C-39
[11] C-42.
[12] A stipulation was entered into by the parties at trial with regard to the authenticity of the form. See C-43].

four shell casings, which were bagged as evidence to be processed by the International Ballistics Identification System (IBIS) . [N.T., 11/13/2019 p. 218]. [13]

Brian Knowlton is employed by the Delaware County Criminal Investigation Division as a digital forensic analyst and has been so employed since 2015. [N.T., 11/13/2019 p. 159]. Analyst Knowlton's duties include examining computers, video surveillance, cellular phones, or any other like devices. [N.T., 11/13/2019 p. 160]. Analyst Knowlton completed his bachelor's degree in computer forensics and has attended many trainings and achieved multiple certifications in computer analyst software, particularly from the specific companies whose software he uses. [N.T., 11/13/2019 p. 160].

In May of 2019, Analyst Knowlton had occasion to become involved with the investigation pertaining to Appellant. [N.T., 11/13/2019 p. 160]. Pursuant to validly obtained search warrants, Analyst Knowlton was provided Appellant's two iPhones for extraction. [N.T., 11/13/2019 p. 163]. [14]

Analyst Knowlton personally performed the extraction on both devices. [N.T., 11/13/2019 p. 163]. When performing an extraction on a cell phone, Analyst Knowlton typically uses a software called "Cellebrite" which is known as the leading software in mobile forensics. [N.T., 11/13/2019 p. 163]. Analyst Knowlton has received training and is certified through Cellebrite on

---

[13] See photos C-44-56.

[14] At trial, a stipulation was entered that on April 10, 2019, Officer Canfield of the Chester City Police Department, applied for a search warrant for the T-Mobile records pertaining to Appellant. The search warrant was approved and signed on April 14, 2019. On April 15, 2019, Detective Canfield executed and applied for a search warrant for the Apple iPhone, black in color with clear case and red trim found on Appellant. That search warrant was approved and signed on April 18, 2019. On April 16, 2019, Detective Canfield executed and applied for a search warrant for the Apple Phone, silver in color with black and red case found on Appellant. That search warrant was approved and signed on April 18, 2019. On April 18, 2019, Detective Canfield executed a search warrant and delivered both iPhone to CID for analysis.

how to use the software. [N.T., 11/13/2019 p. 163]. The software allows an analyst to extract the data from the device using what is called "Graykey", and then Cellebrite takes the data extracted by Graykey and puts the data into a more readable format so it can be interpreted. [N.T., 11/13/2019 p. 163]. Using Graykey and Cellebrite, Analyst Knowlton was able to extract data from both iPhone devices. [N.T., 11/13/2019 p. 165]. [15]

With regard to both iPhones, the extracted data consisted of call records, contact lists, chat messages, MMS messages (messages which contain picture or long text) and SMS messages (standard text messages, images and videos). [N.T., 11/13/2019 p. 165-172]. With regard to the call logs, a report was generated.[16] A second and third report contained location data of both phones, including the GPS location data.[17].

When analyzing the GPS data, Analyst Knowlton was able to determine that at 3:36 am on the morning of June 26, 2018, the GPS coordinates of Appellant's phone, when cross-referenced with Google Maps, put him in the area of 6th and Highland Avenue in Chester, PA. [N.T., 11/13/2019 p. 185]. At 3:42am, Appellant's phone was in the location of Veteran's Memorial Park in Chester. [N.T., 11/13/2019 p. 186].

Appellant was arrested and charged with four separate criminal Informations, one for each of the interactions detailed above.

---

[15] The reports generated by Cellebrite were marked as C-19.
[16] Admitted as C-21 at trial.
[17] Admitted as C-22 at trial and C-23.

## PROCEDURAL HISTORY

On March 5, 2019, the Commonwealth filed a Motion for Joinder, arguing that all four incidents occurred within a three-month time period, the last three occurring within a matter of hours from each other, all four incidents involved the same victim and that all four incidents, heard in conjunction with one another, paint the complete picture of the nature of Appellant and Ms. Phillips' relationship. In addition, the Commonwealth argued that evidence of any one incident would be admissible at trial in each of the other and that there was no risk of confusion to the jury. This Court held a hearing on April 3, 2019. After review, this Court granted the Motion via Order dated April 23, 2019.

Jury selection occurred on November 12, 2019. Trial commenced on November 13, 2019 and continued through November 14, 2019. The testimony of Ms. Phillips, Officer Richardson, Officer Abreu, Analyst Knowlton, Officer Linowski and Officer Colon, was consistent with the facts as set forth above.

With regard to Analyst Knowlton's testimony, counsel for Appellant objected when he began to explain the use of google maps. [N.T., 11/13/201 9p. 178]. At sidebar, counsel explained that she was not objecting to the use of google maps but rather that she believed the testimony was starting to get technical, and that if got further into cell phone extraction, she was objecting to the testimony going beyond the scope of a lay person. [N.T., 11/13/2019 p. 180]. This Court allowed the Commonwealth to explore the topic further. Counsel for Appellant did not raise any further objection. [N.T., 11/13/2019 p. 180]. On cross, counsel for Appellant cross-examined Analyst Knowlton on his use and knowledge of the software. [N.T., 11/3/2019 p. 191]. At no point did Analyst Knowlton ever offer any opinion.

11

The jury reached verdicts on each of the four incidents. On docket #6866-2018, wherein Appellant was charged with Burglary and Theft by Unlawful Taking, the jury found Appellant not guilty on both counts. On docket #6850-2018, wherein Appellant was charged with Aggravated Assault, Recklessly Endangering Another Person, Firearms not to be Carried Without a License, Possession of an Instrument of Crime, and Criminal Attempt-Murder, the jury found Appellant not guilty on all counts.

On docket #6849-2018, wherein Appellant was charged with Terroristic Threats and Stalking, the jury found Appellant guilty on both counts. On docket #6873-2018, wherein Appellant was charged with Criminal Attempt-Murder of the First Degree, Aggravated Assault, and Discharge of a Firearm into an Occupied Structure, the jury found Appellant guilty on all counts.

Post-sentence motions were filed, and a hearing held on March 4, 2020. On March 9, 2020, the motions were denied via order. Appellant filed an appeal on April 4, 2020. On April 16, 2020, this Court issued an order requesting that Appellant filed a 1925(b) statement. On May 2020, this Court granted counsel's request for additional time in which to file the statement. As the statement was due in the middle of the courthouse closure due to the COVID 19 pandemic, counsel needed more time to which to access and review the file. The statement was filed on June 5, 2020, which prompted this Court to author a letter to the Superior Court asking for an additional sixty days in which to file its 1925(a) Opinion. [18]

---

[18] For unknown reasons, the letter was not docketed or received by the Superior Court.

12

## DISCUSSION

## THIS COURT PROPERLY GRANTED THE MOTION FOR JOINDER.

Pennsylvania Rules of Criminal Procedure 582(A)(1) provides that distinct offenses which do not arise out of the same act or transaction may be tried together if the "evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion or the offenses charged are based on the same act or transaction."

Whether to join or sever offenses for trial is within the trial court's discretion and will not be reversed on appeal absent a manifest abuse thereof, or prejudice and clear injustice to the defendant. *Commonwealth v. Knoble*, 188 A.3d 1199 (Pa. Super. 2018).

In deciding whether or not to join offenses for trial, the court must determine: (1) whether the evidence of each of the offenses would be admissible in a separate trial for the other; (2) whether such evidence is capable of separation by the jury so as to avoid danger of confusion; and, if the answers to these inquiries are in the affirmative, (3) whether the defendant will be unduly prejudiced by the consolidation of offenses. *Id.*

In regard to the first prong of the analysis, Courts have held that the analysis is akin to a 404(b) analysis; whether evidence of other crimes would be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident so long as the probative value of the evidence outweighs its prejudicial effect. *Commonwealth v. Smith*, 47 A.3d 862, 867 (Pa. Super. 2012). Another exception is the common law "same transaction" or "res gestae" exception. This exception is applicable in "situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were

13

part of its natural development." *Id.* In other words, the exception applies to prior bad acts "which are so clearly and inextricably mixed up with the history of the guilty act itself as to form part of one chain of relevant circumstances, and so could not be excluded on the presentation of the case before the jury without the evidence being rendered thereby unintelligible. *Knoble,* 188 A.3d at 1206.

In regard to the second prong, where a trial concerns distinct criminal offenses that are distinguishable in time, space and the characters involved, a jury is capable of separating the evidence. *Commonwealth v. Collins,* 550 Pa.46 (1998).

In regard to the third prong, the prejudice which must be considered in determining whether to order separate trials of offenses or defendants is not simply prejudice in the sense that defendant will be linked to crimes for which he is being prosecuted, but is prejudice which would occur if evidence tends to convict defendant only by showing his propensity to commit crimes or because jury is incapable of separating the evidence or cannot avoid cumulating the evidence. *Id.*

In *Knoble,* the trial court considered the Commonwealth's Motion for Joinder of Appellant's Criminal Homicide, Terroristic Threats, Criminal Mischief, and Unauthorized Use of a Motor Vehicle. The court found that each of the offenses was "so interwoven that the Informations must be joined in order to demonstrate the history and natural development of the facts. The court stated, "these two cases occurred almost simultaneously, were investigated simultaneously, and share common facts. *Id.* Therefore, the court concluded that the Commonwealth demonstrated that these offenses "occurred within the same transaction or occurrence." *Id.* The court also found that denying the Commonwealth the opportunity to present the overall picture and natural sequence of events by trying these offenses separately would confuse and mislead the jury. *Id.* Thus, the court concluded that the probative value of joinder

outweighed the potential prejudice to Appellant. The Pa. Superior Court agreed with the joinder, stating: "Given the timeline of events and the interrelatedness of Appellant's crimes as described above, including his use of the same weapon to shoot at Ms. Douglas's vehicle and to kill the victim, the evidence of each crime would have been admissible in the trials for the other offenses so that the jury could fully understand the natural development of the case." *Pg. 1204.*

Here, the incidents in question involved the same defendant, same victim, and many of the same witnesses. Additionally, all four of the incidents occurred within a four-month time period, the last three of which occurred within a 48-hour span. In addition, the joinder of all four cases did not, in any way, suggest to the jury that they should convict Appellant because of some violent or criminal propensity. Rather, the joinder of the cases enabled the Commonwealth to present the jury with complete picture of the history between Appellant and the victim, which was vital to a determination. Furthermore, this was no risk of confusion to the jury. Each of these incidents occurred at a distinct time and place that are well documented. In addition, this Court drafted the verdict sheets very clearly, each one identifying by date and time, the incident that the verdict sheet applied to. Most supportive of the fact that the jury was not confused, is the fact that they found Appellant guilty of two of the four incidents, evidencing that they were able to separate the incidents and determine which ones they found that the Commonwealth presented beyond a reasonable doubt.

15

## ANALYST KNOWLTON'S TESTIMONY WAS NOT EXPERT TESTIMONY NOR DID HE OFFER ANY EXPERT OPINION.

*Pa. R. Evid. 702* governs expert witness testimony. It states, "a person who is qualified as an expert by knowledge, skill, experience, training or education may testimony in the form of an opinion or otherwise if: (a) the expert's scientific, technically, or other specialized knowledge is beyond that possessed by the average layperson; (b) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and (c) the expert's methodology is generally accepted in the relevant field. *Commonwealth v. Nevels,* 203 A.3d 229 (Pa. Super. 2019).

*Pa.R.Evid. 701*, regarding "Opinion Testimony by Lay Witnesses" provides, if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

"Technical expertise does not ipso facto convert a fact witness, who might explain how data was gathered, into an expert witness, who renders an opinion based on the data. Fact testimony may include opinion or inferences so long as those opinions or inferences are rationally based on the witness's perceptions and helpful to a clear understanding of his or her testimony." *Commonwealth v. TB*, 2020 WL 2519623 (Pa. Super. 2020).

16

Here, Analyst Knowlton did not offer any expert opinion. Analyst Knowlton's testimony was based upon his job experience as an analyst. The technical aspect of his testimony was solely explaining what the software does to the phone in order to extract the data. In addition, the GPS coordinates being cross refenced with the google maps, was not objected to by counsel. At sidebar, counsel stated that she was fine with that testimony. Analyst Knowlton's testimony was not based on scientific or specialized knowledge under Rule 702. Rather, his testimony was helpful to clearly understanding the witness's testimony or to determining a fact in issue, particularly Appellant's location at the time of the incidents.

## THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice. *Commonwealth v. Bright,* 2020 WL 3409250 (Pa. Super. 2020).

"The weight attributed to the evidence is a matter exclusively for the fact finder, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The grant of a new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a re-assessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that, notwithstanding all of the facts, certain facts are so clearly of greater

17

weight, that to ignore them or to give them equal weight with all of the facts is to deny justice. An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice. " *Commonwealth v. Johnson,* 192 A.3d 1149, (Pa. Super. 2018).

Appellant's weight claim lacks merit. This Court did not abuse its discretion in concluding that the verdict was not objectively shocking. The jury chose to believe the testimony because they found it to be credible. In addition, the two dockets on which Appellant was found guilty or had a plethora of corroborating evidence to support Ms. Phillips testimony, including the testimony of several officers as well as physical evidence, including shell casings. There was nothing so contrary to the evidence as to shock one's sense of justice that would have permitted this Court to reverse the jury's findings.

## CONCLUSION

For the aforementioned reasons, this Court respectfully asks that Appellant's judgment of sentence be affirmed on appeal.

BY THE COURT:

_____

JOHN P. CAPUZZI, SR.,          J.

18